## McMULLAN v. HOFFMAN.

### (Circuit Court, D. Oregon. August 26, 1895.)

### No. 2,204.

CONTRACTS—ILLEGALITY—COLLUSIVE BIDDING.

A secret contract, between persons proposing to bid upon the construction of a public work, by which their bids are to be put in, apparently in competition, but really in concert, with the intention of securing as high a price as possible, and dividing the profits, is illegal, and contrary to public policy, and will not be enforced, though one of the parties to it has secured the contract for the public work, and has executed the same, and received the profits.

L. B. Cox, for plaintiff.
Rufus Mallory, for defendant.

BELLINGER, District Judge. The questions in this case for decision arise upon exceptions to the answer of Hoffman. The suit is upon a written contract between the parties, by which they agreed to share equally in a certain contract, for the construction of the Bull Run pipe line, entered into between the city of Portland and the defendant.

The complaint alleges that prior to March 6, 1892, the city of Portland, through its water committee, invited bids for the construction of a system of waterworks; that, before the time within which bids were to be received for such work, it was agreed between complainant and defendant that they would jointly endeavor to obtain the contract therefor, and that in their joint interest a bid should be put in for the construction of said waterworks, and that, in case they were successful, they should share equally in such contract as resulted from such joint bid; that, in pursuance of this agreement, a bid was put in, in the firm name of Hoffman & Bates, under which name the defendant was doing business, for the manufacture and laying of steel pipe from the head works of the water system to Mt. Tabor, which bid was found to be the lowest bid made for such work; that the contract for which such bid was made was thereupon awarded to the defendant, Hoffman; that thereupon, in evidence of their agreement, complainant and the defendant entered into a written agreement that they would share equally in the expenses, profits, and losses of such contract as should be en-

tered into between the city of Portland and Hoffman & Bates in respect to the work covered by the bid referred to; that thereafter the defendant, in the name of Hoffman & Bates, entered into a contract with the city of Portland for the work in question, and the complainant and defendant proceeded with said work, and completed the same about January 1, 1895; that the complainant contributed valuable services, by himself personally and by his employés and agents in California and elsewhere, in such work, and contributed money and property for equipment therein, to the amount of $2,414.46, or thereabouts, and has at all times been ready and willing to do anything necessary and required of him in that behalf; that the complainant and defendant did other work for bringing Bull Run water to Portland, in connection with and supplementary to the work done under the contract mentioned; that, at the time of the execution of the contract between the parties hereto, it was agreed that, within the state of Oregon, the defendant was to have superintendence of the work, manage all matters in connection therewith, and receive from the city all payments due on account of such construction contract, and that defendant so did act and manage, and receive payments from the city; that the defendant refuses to account to the complainant for the profits earned under said contract, which complainant believes to amount to $80,000, or to allow complainant to inspect the records or books of account kept by defendant touching said work.

The defendant admits that, before the time for receiving bids had elapsed, it was agreed between the parties in the suit that they would endeavor to obtain the contract in question, but denies that it was agreed that they would act jointly to that end, but alleges: That, on the contrary, it was agreed between them that they should not act jointly, but severally, defendant acting in the name of Hoffman & Bates, and complainant acting in the name of the San Francisco Bridge Company. "That it was mutually and secretly agreed by and between the complainant and the defendant, before the bids hereafter mentioned were filed with the said water committee, that the complainant should make and file with the said water committee several bids, for portions of said work, in the name of the said San Francisco Bridge Company, and the defendant should in like manner make and file several bids with said committee, for the same portions of said work, in the name of Hoffman & Bates; and that said bids should be made so as not to compete with each other, but so as to avoid it. That it was further agreed that for that purpose, and to more surely effectuate the object of getting a contract for said work at as high a figure as possible, and for the purpose of enhancing the profits of complainant and defendant, both the complainant and defendant, before said bids were filed, should examine the same, and know the contents thereof; and that, pursuant to said understanding, the complainant did submit to the defendant, for his examination and approval, the bids which he proposed to file with said committee for said work and the furnishing of material, and in like manner the defendant submitted to the complainant, for his approval, the bid which he proposed to file with

said committee for said work and the furnishing of material; and the defendant disapproved of the complainant's bid, and required that the same be raised about ($98,000) ninety-eight thousand dollars above and more than complainant proposed and intended and was about to bid for said work, which was done; and the complainant disapproved of the defendant's bid, and required that the same be reduced about $13,000 below what the defendant proposed and intended to bid for said work and the furnishing of material named in said bid, which was also done; and the said bids, containing the new amounts secretly agreed upon by said parties, were then filed with said water committee, and complainant and defendant mutually agreed to share the profits and losses in the execution and performance of said contract; and this defendant, for greater certainty, asks to refer to each and all of said bids upon the trial of this cause. * * * That in preparing bids for the materials and work afterwards awarded to the defendant, as hereinbefore stated, complainant and defendant agreed and combined together to obtain the highest possible price from the city for the same, and so arranged their respective bids for the various kinds of work and materials required as that they should not operate as competing bids, although appearing to said committee to be so." The answer contains, among others, the following additional averments:

"Defendant further avers and alleges: That complainant not only refused to furnish any surety in the bond required under the bid of Hoffman and Bates, accepted by the city water committee, to insure the performance of the contract by the bidder, and required and compelled the defendant to furnish the said bond, and all the sureties thereon, and refused to furnish his proportionate share of the money required and necessary to carry on the work under said contract, and to pay the bills for labor and materials as they fell due, but complained of defendant that he would not and did not refuse to pay supply and other necessary bills of expenses incurred in carrying on said work, and recommended that, instead of paying such bills, the defendant should 'stand the creditors off'; declared that defendant was very foolish to try to meet every payment promptly; said 'he would stand them off for everything, or pay them 50 %, or whatever he could out of the estimates, and such things as supplies for camps he would not pay for six months, if he did not feel like it'; although the defendant had been obliged, in securing supplies and labor, to contract for paying the same at the end of each month, as complainant well knew, yet the complainant, refusing to put in his share of the money to pay these bills as aforesaid, desired the defendant to disregard his contracts, and 'stand off' his creditors, as aforesaid. * * * Defendant further avers and alleges that on the 16th day of September, 1893, he had already advanced and expended, of his own funds, in carrying on said work under said contract with the city of Portland, $15,990; that bills for said work to fall due on the 25th day of September, 1893, amounted to about $22,500; that on the 11th day of September, 1893, defendant was notified by the said committee that it was without funds with which to pay the estimates for the completed work for the month of August, and had no assurance when money for that purpose could be obtained; that, in order to be prepared to meet the payments so to fall due on the 25th day of September, defendant, on his own account, by furnishing his own collaterals, secured, at considerable loss and sacrifice, $14,000, which would not have been necessary or required if complainant had not refused to provide the money he promised and agreed to furnish; that the said plant purchased by defendant at Seattle, by request of complainant, was purchased from the San Francisco Bridge Company, and bills therefor were rendered by said company to Hoffman & Bates, as well as for the said hydraulic punch and shears in said bill of complaint mentioned, and that said Hoffman & Bates forwarded

and tendered to said San Francisco Bridge Company, at San Francisco, Cal., full and complete payment of the several sums and amounts claimed in said bills; that said San Francisco Bridge Company refused to accept the money so tendered; that said defendant has, at all times since said bills were rendered, been ready, able, and willing, and is now ready, able, and willing, to pay for said material, punch, and shears in full."

To these several portions of the answer the complainant excepts for impertinence, on the ground that the alleged fraud in procuring the construction contract from the city of Portland is not material in a suit for profits arising upon an independent contract between the parties for the construction of the work under the contract so procured. The case mainly relied upon by complainant is that of Brooks v. Martin, 2 Wall. 70. That was a case of partnership to buy soldiers' claims, and land warrants issued therefor, to locate lands under such warrants, and sell the same. Congress, to protect the soldier from his own improvidence, had enacted that any sale or contract going to affect the title or claim to any such bounty, made prior to the issue of such warrant, should be null and void to all intents and purposes whatsoever. Martin, the complainant in the suit, advanced all the money used in the enterprise, to the amount of $50,000. He trusted the business entirely to the management of his two partners, who managed it at a distance of 2,000 miles from Martin's home. The business was very profitable, of which fact Martin was kept in ignorance, and he was finally induced, by various fraudulent expedients, to sell his interest to his partners for what the court refers to in its opinion as "substantially nothing." His share in the profits at the time were $30,000. Upon being advised of the fraud that had been practiced upon him, he brought suit to cancel the sale of his interest, and for an account and division of the profits. The court decided that after a partnership contract confessedly against public policy has been carried out, and money contributed by one of the partners has passed into other forms,— the results of the contemplated operation completed,—a partner in whose hands the profits are cannot refuse to account for and divide them on the ground of the illegal character of the original contract. The court cites the case of Sharp v. Taylor, 2 Phil. Ch. 801, where the parties, who were British subjects, bought an American vessel, which had stranded off the port of Liverpool, rescued and repaired her, and put her in service between British and American ports. The ship was registered in the name of a citizen of the United States, to evade an act of parliament which prohibited other than British ships to engage in such service under British ownership. One of the owners having refused to account to the other for profits earned, suit was brought, and relief decreed. The lord chancellor said:

"He [the complainant] is not seeking compensation and payment for an illegal voyage. That matter was disposed of when Taylor received the money, and the plaintiff is now only seeking payment for his share of the realized profits. The violation of law suggested was not any fraud upon the revenue, or omission to pay what might be due, but, at most, an invasion of a parliamentary provision supposed to be beneficial to the shipowners of this country; an evil, if any, which must remain the same, whether the freight be divided between Sharp and Taylor according to their shares or remain altogether in

the hands of Taylor. As between these two, can this supposed evasion of the law be set up as a defense by one against the clear title of the other?"

In Planters' Bank v. Union Bank, 16 Wall. 483, it was held that an action would lie for the recovery of the proceeds of a sale of Confederate bonds, which had been sold by the defendant on the account of the plaintiff. Assuming that a contract for the sale of such bonds was unlawful, the court held that when the illegal transaction had been consummated, and the proceeds of sale had been actually received, and carried to the credit of the plaintiffs, such proceeds may be a legal consideration between the parties for a promise, express or implied.

The doctrine thus laid down is applied in Burke v. Flood, 1 Fed. 541; in Western Union Tel. Co. v. Union Pac. Ry. Co., 3 Fed. 423; in Wann v. Kelly, 5 Fed. 584; and in Buchanan v. Bank, 5 C. C. A. 83, 55 Fed. 223. The first of these cases involved the Bonanza mine owners Flood, O'Brien, Mackey, and Fair, and related to the manipulation of corporations controlled by them for the benefit of themselves as partners. The court said:

"I take it there can be no doubt that a partner is entitled to contribution from his copartner when he has paid more than his share of the firm liabilities, even though the liabilities grow out of a tortious act of the firm. When money has come into the hands of a partnership, on a partnership transaction, however wrongfully or unlawfully acquired, as between the members, it is partnership assets, and must be accounted for as such between themselves."

The case was not tried upon its merits, but was disposed of on a question of parties. It did not necessarily involve actual fraud or moral delinquency. As to this, the opinion is as follows:

"As now presented, no answer ever having been filed, the matter rests upon naked allegations upon information and belief. It is impossible to anticipate what may turn out in the proofs. It may possibly turn out, in some legal aspects of the case, that defendants may be adjudged to account, whether rightfully or not, under circumstances disclosing no actual fraud, and no moral delinquency at all. In such a case a right to contribution would certainly arise in favor of the party who is called upon to pay more than his share, even though there is no partnership between them."

In the second case—Western Union Tel. Co. v. Union Pac. Ry. Co.—the question was raised as to the right to transfer a franchise to build and operate a telegraph line on the right of way of the railway company. The court held that, even if it assumed "that the contract is void, the property accumulated or constructed under it must, as between the parties, be disposed of according to equity; and the court will not refuse to deal with that property on the ground that it was acquired under an illegal contract." The case of Wann v. Kelly involved a stock-gambling transaction. It is held that, although the business was contrary to public policy, and illegal, when the business was closed, and one of the partners had received the profits, he was in duty bound to pay over to the other party his part of it. The case of Buchanan v. Bank was a case of a partnership to pasture cattle in the Cherokee country, without contract with the Cherokee Nation or authority of congress. The partners borrowed $25,000 to carry on this unauthorized business, and gave their note for it. Upon maturity of this note, they

gave two others, of $12,500 each, to pay the first, and, upon suit being brought on one of these notes, defended on the ground that the first note provided means for an illegal transaction, and was therefore for an illegal consideration, and that the second notes, given for the first, inherited its vice. This defense, it goes without saying, failed.

The doctrine of these cases applies in all cases where recovery is sought on account of contracts that are forbidden by law, or, in case of corporation contracts, that are ultra vires. While such contracts will not be enforced, yet, if they have been executed, the party having their benefits must fulfill his own obligations in consequence of them. In none of the cases cited was there actual fraud, or other moral delinquency. The profits derived from the purchase and location of soldiers' warrants in Brooks v. Martin, 2 Wall. 70, do not appear to have been at the expense or to the injury of the soldiers from whom the warrants were purchased. So far as appears, such warrants may have been paid for at their full value, and under circumstances that were advantageous to those selling them. The policy of the law forbade such dealings in order, solely, to guard the soldiers from their own improvidence. So, in the case of Sharp v. Taylor, the policy of the law prohibited British owners from using other than British ships in the particular trade in question. "The violation of law suggested in the case was not," said the lord chancellor, "any fraud upon the revenue, or omission to pay what might be due, but, at most, an invasion of a parliamentary provision supposed to be beneficial to shipowners of the country." In none of the cases did the right to be enforced depend upon considerations that appeared to be immoral or wrong in themselves. While the statement, in the opinion in Burke v. Flood, that a partner is entitled to contribution where he has paid more than his share, even though the liability grows out of a tortious act of the firm, seems broad enough to authorize the conclusion that the profits of an immoral completed transaction may be recovered, yet there was no such question in the case, and the matter is freed from doubt, both as to the facts of the case in this respect and the conclusion to be drawn from the opinion, by the statement of the court that "it may possibly turn out, in some legal aspects of the case, that defendants may be adjudged to account, whether rightfully or not, under circumstances disclosing no actual fraud, and no moral delinquency at all." "In such a case," says the court, "a right to contribution would certainly arise." In Watson v. Murray, 23 N. J. Eq. 257, the court recognizes the distinction that exists between enforcing the execution of an agreement to do an illegal act and the distribution of the realized profits of the act, but held that the distinction is not to be regarded as of universal or general application, and that such distinction is excluded, in cases of attempted apportionment of gains resulting from criminal practices, by manifest considerations of example and influence,—considerations not deemed to exist in the cases where the distinction has been allowed. These considerations

necessarily exist in all cases of actual fraud or other moral delinquency. The judicial sanction given to fraudulent acts in the apportionment of the realized profits therefrom among the guilty parties would be destructive of private and public morals. The profits of fraud belong in the same category with those of gambling and other immoral practices.

But whether or not there is a distinction between cases where the contract in question is intrinsically fraudulent and bad and cases where its illegality is merely in the prohibition of the statute, the question upon which this case depends may be disposed of on the ground upon which it is placed by the plaintiff; namely, that, where the illegal contract has been fully executed, a party is entitled to a remedy to recover his share of the profits arising from it. In this case the profits sought to be recovered do not grow out of the contract in suit. The plaintiff was not a party to the contract for the construction of the city waterworks, and admittedly had no interest in that contract, except such as he may be entitled to under the contract upon which suit is brought. There was no privity between him and the city water committee. On the contrary, he represented himself, by his bid, as against the bid of defendant, and as adverse to the interests of the defendant in the proposed contract. He assumed no obligation in the executed contract. The right which he asserts does not in any way depend upon that contract, to which he was not a party, and in which he was in nowise obligated. It is not, therefore, a case of an executed contract, legal or otherwise, under which complainant's rights in suit have arisen. The right claimed in this suit is under, not the executed contract between the defendant and the city of Portland to build the city pipe line, but the unexecuted agreement between the parties for a division of the profits of that contract. In all the cases cited by plaintiff, the courts have refused to permit the defense of illegality of the contracts involved to avail, because such contracts were executed. The courts, in granting relief, were, therefore, not required to aid illegal transactions, but merely enforced rights which rested upon new and independent considerations. In Brooks v. Martin the contract had become executed. The illegal transaction was an accomplished fact, and would "not be in any manner affected" by what the court was asked to do between the parties. In decreeing the relief prayed for in that case, the court did not in any manner aid the illegal business, or further what the violated statute was intended to prevent. It did not enforce any provision of the illegal contract. It merely enforced the payment of money which had accrued in the hands of one of the parties, to the benefit of the other, as a result of the execution of the contract in question. The contract under which the profits in this case were realized was not to do an illegal act. The case does not depend upon the city contract, but upon an alleged unlawful agreement for a division of the profits of such contract. The contract on which the profits were realized has been executed, but the express agreement by

which these profits were to be apportioned—the agreement in suit—has not been executed. Otherwise, the occasion for this suit would not exist.

The case is within the principle adopted in Meguire v. Corwine, 101 U. S. 108. There was a contract by which one party was to procure the appointment of another as special counsel in certain cases against the United States, and aid the appointee in the defense of such causes, in consideration of which he was to receive one-half of the fee paid by the government for the services rendered. The appointment was procured, and the services rendered, as stipulated, and the defendant received $29,950 as a fee, but refused to account to plaintiff for any part of it. It was held that the plaintiff could not recover. The court said:

"The law touching contracts like the one here in question has been often considered by this court, and is well settled by our adjudications. Marshall v. Railroad Co., 16 How. 314; Tool Co. v. Norris, 2 Wall. 45; Trist v. Child, 21 Wall. 441; Coppell v. Hall, 7 Wall. 542. It cannot be necessary to go over the same ground again. To do so would be a waste of time. The object of this opinion is rather to vindicate the application of our former rulings to this record than to give them new support. They do not need it. Frauds of the class to which the one here disclosed belongs are an unmixed evil. Whether forbidden by a statute or condemned by public policy, the result is the same. No legal right can spring from such a source. They are the sappers and miners of the public welfare, and of free government as well. * * * The contract is clearly illegal, and this action was brought to enforce it."

In the case of Trist v. Child, cited above, the action was for a percentage of a claim collected from the government, through the efforts of plaintiff as a lobbyist, under an agreement by which he was to receive such percentage. Included in the contract there were services rendered "in drafting a petition setting forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them orally or in writing to a committee or other proper authority, with other services of like character, intended to reach only the understanding of the persons sought to be influenced." But because these meritorious services were "blended and confused" with those which were forbidden, the entire contract was held to be fatally affected, and relief was refused. In Buck v. Albee, 62 Am. Dec. 564, the court held that a contract connected with and growing immediately out of an illegal act would not be enforced; that whenever it is necessary for the plaintiff to prove such illegal contract, in order to recover, no recovery can be had.

The case of Hannah v. Fife, 27 Mich. 172, lays down a principle that is decisive of this case. This was a case where the party to whom a contract was awarded for the construction of a swamp-land state road entered into a contract with his competitor by which the latter took the contract upon terms somewhat more favorable for the public than the bid upon which the award was made, and agreed to pay the successful bidder eight sections of land as a bonus for the relinquishment of his bid. The law allowed two sections of land per mile of road as the maximum quantity for the work. Each of the two bids was for this amount. The bid, however, of the

unsuccessful bidder, who subsequently took the contract by agreement as stated, was for a roadbed only 16 feet wide, while the state requirements were for one 20 feet wide. The court said that there was no evidence of a previous agreement between the parties, except such inferences as may be drawn from the circumstances and the contracts made, and that it was "difficult to resist the conclusion that these things tend pretty strongly to show the existence of some such previous understanding." But the court held that whether there was in fact any such secret understanding was immaterial; that, without such understanding, the tendency of all such contracts between bidders as that in existence in the case "must be to afford encouragement and give facilities to bidders to enter into and give full effect to such secret agreements and combinations, and to enable them to defeat the plain intent and object of the legislature in requiring such contracts to be let to the lowest responsible bidder"; that it was "this tendency, rather than the fact of actual fraud in the particular transaction, which is generally recognized as rendering contracts void as against public policy"; and that the contract sued upon must be held void upon this ground. The doctrine of the case, in short, is that secret agreements between bidders for their mutual profit, and to avoid competition with each other, while keeping up the appearance of competition, and all agreements having that tendency, are void, and will not be enforced; nor will an agreement between different sets of bidders for a public contract, by which one agrees, in consideration of a sum of money to be paid by the other, to withdraw his bid, and assist the latter to obtain the contract, be enforced. Sharp v. Wright, 35 Barb. 236; Gulick v. Ward, 18 Am. Dec. 389.

As has already been stated, any relief decreed the plaintiff requires the enforcement of the unexecuted provisions of the contract by which plaintiff was to share with the defendant the profits of the work on the contract awarded Hoffman in the name of Hoffman & Bates. What was that contract? Plaintiff insists that the court cannot look beyond the written agreement set out in the complaint. The written contract is to share equally in the expenses and profits of any contract that should be entered into between the defendant and the city on an award already made the defendant, as the lowest bidder for such work. The complaint alleges an agreement between plaintiff and defendant, anterior to the bid, by which, in effect, the plaintiff should have a joint interest with the defendant in the latter's bid, and that the written contract was in evidence of this agreement. The averments of the answer refer to this identical agreement, and allege considerations embodied in it to show its illegal and fraudulent character. In other words, the answer impeaches the precise transaction alleged in the complaint as the ground of plaintiff's right. The contract thus shown is indefensible. It was a secret contract by which the parties were to pretend to be competitors for the work to be let, while, in fact, they were not so. The bids were for four classes or items of work, and were so arranged between the parties beforehand that the bid of plaintiff was lower than defendant's bid as to three of such items,

while the defendant's bid was so far below that of plaintiff, as to the remaining single item as to make the aggregate of his bid $35,000, in round numbers, less than that of plaintiff. It is alleged that plaintiff was prepared to bid, and, but for the secret agreement, would have bid, for such work, at a figure some $40,000 less than that at which the contract was let. As to this, it is argued, in plaintiff's behalf, that he was under no obligation to bid upon said work, and might refrain from doing so, at his option. But when he seeks to recover for withholding such bid, it is another matter. The tendency of such a recovery will be to encourage combinations among bidders, destroy competition, defeat the object the legislature had in view in requiring such work to be awarded upon bids, and greatly increase the public burdens. If there was nothing more in the case than an agreement not to bid, there could be no recovery under the contract based upon such a consideration. But when the parties presented themselves as competitors for the work, they were guilty of a fraud. The tendency of what was thus done was to cause the water committee to believe that the bid of defendant was a favorable one for the city. Moreover, plaintiff's pretended bid had the effect of a representation to the committee that, in plaintiff's opinion, the work could not be profitably done for less than a figure $35,000 higher than that bid by defendant, although, as a matter of fact, plaintiff believed such work could be done, and, except for the collusive agreement with defendant, would have offered to do it, for an amount $75,000 less than that at which the contract was let. Upon all the cases cited or to be found, and in any view of the case consistent with public policy and the principles of equity, there can be no relief in such a case.

It is not necessary to discuss the minor questions raised by the exceptions to parts of the answer. The third, ninth, tenth, and thirteenth exceptions, for impertinence and scandal, are allowed. All other exceptions are overruled.