McMULLEN v. HOFFMAN.

(Circuit Court, D. Oregon. June 23, 1896.)

No. 2,204.

1. CONTRACT OBTAINED BY IMMORAL MEANS—ACCOUNTING BETWEEN CONTRACTORS.

The fact that parties have, by immoral means, obtained an award of a joint contract with a city for the construction of a public improvement, will not prevent one of them from maintaining a suit against the others for his share of the profits made by performance of the contract. 69 Fed. 509, reversed.

2. CONTRACTS FOR PUBLIC IMPROVEMENTS—BIDS BY CONTRACTORS.

One bidding for a contract to be let by a city is under no obligation to give the city the benefit of knowledge acquired at his own expense by obtaining the estimates of competent engineers as to the cost of constructing the proposed work, even if the means of such knowledge is not within the city's reach.

3. SAME—ATTEMPTED FRAUD.

Two contractors, by previous agreement, made a bid for their joint benefit, in the name of one of them and a third person, for the construction of certain city improvements, and the contract was awarded

to them. One of them, with the other's knowledge and consent, had made a separate bid, at a much higher figure, which was not seriously intended. The city engineer's estimate was higher than the latter bid, and there were three other bids still higher. *Held* that, even if the second bid was put in for a fraudulent purpose, there was, under the circumstances, no room for the inference that it had any influence in the making of the award; and, as the attempted fraud was therefore unsuccessful, it could furnish no ground for refusing to compel one of the contractors to account to the other for his share of the profits made under the contract.

4. SAME—ACCOUNTING—CONTRACTOR'S SALARY.

Where two contractors, by a joint bid, secured a contract to construct a pipe line for the water supply of a city, and one of them failed to furnish his part of the capital, so that the other was obliged to raise all the money needed, and also had the entire charge and supervision of the work, *held*, the profits being $140,000, that the latter was justified in crediting himself with $1,000 per month as salary.

This was a suit in equity by John McMullen against Lee Hoffman to compel an accounting for profits made by the parties on a joint contract, under which they constructed a pipe line for the city of Portland.

L. B. Cox and H. Percy Wright, for plaintiff.
Rufus Mallory, for defendant.

BELLINGER, District Judge. This is a suit for an accounting for the profits earned on a contract to construct a pipe line by which the city of Portland is supplied with water. The water committee representing the city having advertised for bids to construct the line, the parties hereto entered into an agreement by which the defendant, on their joint account, bid for the work in the name of Hoffman & Bates. The complainant, with the knowledge and concurrence of the defendant, made a separate bid in the name of the San Francisco Bridge Company, a company controlled by him. This bid was some $49,000 higher than the bid of the defendant, and was not seriously made. The contract having been awarded to the defendant, a written agreement was entered into by the parties for the execution on joint account of the contract to be entered into by the defendant with the city. The contract awarded on defendant's bid was formally entered into by the city water committee, of the one part, and by the defendant, in the name of Hoffman & Bates, of the other. The contract proved a profitable one, the profits thereunder amounting to nearly $140,000. The defendant refused to account to the plaintiff for any part of these profits, upon the ground that the agreement for a joint bid tended, under the circumstances, to lessen competition, and operated as a fraud upon the city; and therefore will not be enforced in equity, and upon the further ground that the complainant wholly failed to comply with the contract between the parties, and refused to perform the conditions upon which the defendant's agreement to share the earnings of the contract with complainant was made. In this case the contract was in fact the joint contract of these two parties. However immoral the means by which the award of that contract was secured to them, it does not lie in the mouth of either to dispute

upon such grounds the right of the other to share in the profits of that contract. This principle has been applied where the contracts were to do what was forbidden by law or by public policy, and were executed, although in this case the contract was to do a lawful thing. It is only when the fund is the result of an immoral transaction that contribution between the wrongdoers will not be enforced. If the means by which this contract was procured are immoral, this would be a good ground for a refusal by either party to proceed with it, or for a refusal by an injured party to abide by its conditions. Nor is it a case where one party seeks to enforce an illegal agreement for a share in the profits of a contract held by another, as was my conclusion when the case was considered upon exceptions to the answer. The contract with the city was, as between the parties, the contract of McMullen and Hoffman. It makes no difference in whose name it was taken, although in fact it was taken in the name of neither, but in that of Hoffman & Bates, for the benefit of Hoffman and McMullen. The case is not in the least different from what it would be if the suit was by Hoffman against McMullen for a division of moneys received from the profits of this contract by the latter.

When these questions were considered by me on the exceptions to the answer (69 Fed. 509), I was of opinion that it was within the principle of those cases involving agreements for a division of the fees of public offices and for compensation for services in lobbying. This, I am convinced, was an erroneous view of the question. In one of those cases the court is asked to compel, by its judgment, the very thing prohibited by public policy, while in the other it is asked to compel payment for a service forbidden by such policy. The question of division of profits between two parties having equal rights is a very different one. The distribution of the profits of this contract, which are as much the property of one of the parties as of the other, does not violate any rule of morals or of public policy. Moreover, the case on the facts differs materially from that presented on the exceptions to the answer. It is alleged in the answer that the plaintiff was prepared to bid, and, but for the secret agreement alleged to have been made, would have bid, for the work, at a figure some $40,000 less than that at which the contract was let. This put the plaintiff in the position of seeking to recover in the suit for withholding a lower bid, by which the work was made to cost much more than it would otherwise have cost, and brought the case within the principle of Atcheson v. Mallon, 43 N. Y. 150, cited and relied on by defendant. In that case each of the parties had intended to make a proposal on his own account, but, by an agreement between them to share equally in the profits of an award made to either, one of them had been removed from the number of earnest bidders, thus lessening competition, to the public detriment. Folger, J., in delivering the opinion of the court, said:

"If Mallon had promised Atcheson a sum of money if he would refrain from making any proposal, and Atcheson, relying upon it, had made none, and then had sought to enforce the agreement, there can be no doubt that the law would have held the promise void. And why? Not out of any con-

sideration for the parties to it, but because its effect was to remove Atcheson from the number of earnest bidders, and thus, by lessening competition, to detriment the public. And the agreement which was made, laying open to Mallon just what was the judgment of Atcheson of a profitable bid, and removing in effect an interested rival, tended to affect Mallon's action. While Atcheson, confident that, if Mallon succeeded, it was also his own success, lost the impulse to a real competition with him. It seems beyond cavil that the agreement is obnoxious to the rule above stated, and such agreements courts refuse to enforce."

In this case the uncontradicted fact is that McMullen did not intend to bid for the work in question otherwise than jointly with Hoffman; that he came from San Francisco to bid with Hoffman, not to compete with him; and that this was in pursuance of an understanding had between the parties long before. The agreement was merely to secure co-operation between the parties, and, so far from tending to lessen competition, it tended to increase the number of bidders, since it does not appear that either of the parties intended to bid or would have bid on his own account. However this may be, it does appear that the effect of the agreement was to cause, through McMullen's influence, a very much lower bid than Hoffman would have made had he bid on his own account. Hoffman stated to one of the witnesses in the case that McMullen "made him come down between $40,000 and $50,000" in the bid upon which the contract was awarded. It appears that McMullen had procured from his engineer in New York estimates of the cost of the work, and that the amount of such estimate was $416,088, and there was testimony tending to show that this estimate included $80,500 as profits. It also appears that Hoffman's engineer at Portland, upon careful estimates, concluded that the work could be done for $420,000. What, if anything, was allowed for profit in this estimate does not appear. The defendant's counsel argues from these facts that the knowledge of each of these parties that this work could be done at a figure far below the bid agreed on, and yet leave a large margin for profit, would have caused them to make much lower bids if they had been bidding in competition than the joint bid made in the name of Hoffman & Bates. But it does not follow that, in the absence of an agreement to bid jointly, any such several bids would have been made, or that estimates would have been procured; nor is it a ground of complaint that the parties had the advice of capable engineers, and were able to know beforehand that the work could be done for $416,000, and leave a profit of at least $80,000. They were under no moral obligation to lower their bid because of the information they had procured, nor in any manner to give the city the benefit of the knowledge they had acquired at their own expense, even if the means of such knowledge was not within the city's reach.

There is nothing to criticise in what was done by the parties, unless their conduct in presenting a second bid in the name of the San Francisco Bridge Company operated as a fraud on the committee. When this matter was considered on the exceptions to the answer, I was of the opinion that this was the effect of the second bid. It appeared from the pleadings that the profits from the con-

tract at $465,667 amounted to nearly $140,000, and it seemed a necessary inference that a bid by a company such as the one in question, based presumably upon careful estimates, to do the work for $514,664, influenced the award that was made. But this view cannot be sustained. An attempt to deceive must be successful in order to operate as a fraud. If the second bid in this case was in effect a misrepresentation made with a fraudulent intent, it must, in order to avail the defendant, appear to have been acted upon by the committee,—to have influenced their action to the public detriment. However reprehensible the act of the parties was in making the second bid, there is no presumption of fraud arising from it, and it does not appear from the evidence in the case that the water committee was in any degree influenced by it in awarding the contract. On the contrary, the testimony of the chairman of the committee is that the bid of the San Francisco Bridge Company did not have the slightest influence with him, and it appears that the engineer of the water committee had, some three months previously, made for the information of the committee an estimate of the cost of the work covered by these bids, and that such estimate was higher than the bid of the San Francisco Bridge Company. That bid, as already stated, was $514,664. How much higher the city engineer's estimate was than this figure is not stated. But with this estimate, higher than the second bid, and nearly $50,000 higher than the bid of Hoffman & Bates, before them, there is, without the testimony referred to, no room for an inference that the committee was influenced by the second bid, or consulted it. Moreover, it is in evidence that there were three higher bids than that of the San Francisco Bridge Company before the committee when the contract was awarded to Hoffman & Bates.

In the accounting, the only question of serious contest is as to the amount to be allowed Hoffman for his services in conducting the business of the parties under their contract. Hoffman claimed and credited himself at the rate of $1,000 per month for his services. In fixing the amount to be allowed on this account, the responsibility assumed by Hoffman is to be considered. McMullen wholly failed to contribute his share or any share, above a plant, valued at $2,000, to the work being carried on. Hoffman made repeated and urgent appeals to McMullen for the money that the latter was in duty bound to provide. To these appeals McMullen had always the same answer, which was that he did not have the money then, and could not obtain it. On one occasion he suggested that Hoffman should stand the creditors of the partnership off, and he suggested at different times the means by which Hoffman might raise the needed money on their joint note. It is argued for McMullen that Hoffman had credit at the banks, and could borrow what money was needed, but that does not excuse McMullen for failure to fulfill the obligations he was under. Hoffman was not required to use his own credit for McMullen's benefit. McMullen was a nonresident. His company was insolvent. He was without credit, and it is not against Hoffman that his own credit was good. McMullen's name upon a joint note would be of no assistance to Hoffman in procur-

ing needed funds, which, after all, must be had upon Hoffman's credit.

There was such an entire failure on McMullen's part to fulfill his obligations in the contract that Hoffman would, in my judgment, have been justified in treating the contract as abandoned by Mc-Mullen; and this was threatened. It is only from the fact that Hoffman continued to recognize McMullen's relation in the business, by regularly charging for his own services, that I am justified in treating the partnership relation as having continued. The entire burden was upon Hoffman, and it involved not only the conduct of the business of constructing the work, but all the money responsibility that attached to it; and this goes to increase the amount to which Hoffman is in good conscience entitled for his services, on which account he is entitled to be paid at the rate charged.