GEORGE W. CHRISTIANS v. TOWN OF EAST RIDGE.

Eastern Section. April 28, 1928.

R. P. Frierson, of Chattanooga, for appellant.
Hamby & Ziegler, of Chattanooga, for appellee.

SNODGRASS, J.   This bill was filed to collect commissions due under a contract for the sale of an electrical distributing system belonging to the defendant.

The answer admitted the contract by which seven and one-half per cent of the sale price was agreed to be paid, but insisted that complainant had failed to comply with his contract, in that he did not make an appraisal of the part of the electrical distributing system owned by the Town of East Ridge as provided for in the contract, and did not determine and establish the right of the Town of East Ridge in respect to the ownership, legal rights, etc. of the defendant in the light and power line in question as provided for in the contract; and, further, that he did not negotiate a sale of the light and power line to the Tennessee Electric Power Company.   It was insisted that through its mayor, Fred Frawley, it negotiated the sale for the sum of $25,500; that it waited upon complainant to comply with his contract, and that when Mayor Frawley took the matter up with the Tennessee Electric Power Company they advised him that they had refused to negotiate with the complainant with regard to the purchase of the light and power line of the Town of East Ridge; and that, after being so advised, the Town of East Ridge, through its mayor, the said Fred Frawley, made sale direct.   The answer continued:

"Defendant for further answer says, that in the event the court should find that complainant had sufficiently complied with his contract to be entitled to compensation for services rendered, that the complainant, Geo. W. Christians agreed with the Town of East Ridge through its mayor, Fred Frawley, that he should receive as such compensation one thousand ($1,000) dollars in lieu of the seven and one-half per cent commission as provided in the original contract."

Proof was taken and the cause heard before the Chancellor, who made and entered the following decree:

"This cause came on to be heard on the 13th day of May, 1927, before the Honorable W. B. Garvin, Chancellor, upon the original bill, the answer of the defendant and the proof

on file in this cause, from consideration of all of which it appears to the court that the cause of action alleged in the bill is fully met and denied by the answer. That complainant did not and could not perform the contract which he had entered into with the Town of East Ridge for the sale of the electrical distribution system belonging to East Ridge, which contract formed the basis of his petition. And it further appearing to the court that complainant was guilty of fraud in preparing and submitting to defendant a bogus offer to purchase the distribution system, and that by reason of such fraud complainant has not come into court with clean hands and is, therefore, not entitled to recover. It is, therefore, ordered, adjudged and decreed by the court that the bill of complainant be dismissed and that the complainant and R. P. Frierson, his prosecution surety, pay the costs of the cause for which let execution issue. The memorandum opinion of the Chancellor is made a part of the record.

"From which complainant prays an appeal to the next term of the Court of Appeals at Knoxville, which appeal is granted upon complainant giving bond as required by law.

"Upon application complainant is granted thirty days after the expiration of the present term to execute said bond.

"This decree is entered nunc pro tunc."

The complainant, perfecting his appeal, makes the following assignment of error.

"The Chancellor erred in ruling that:

"I. Complainant did not perform his contract. He could not and did not negotiate for the sale of the plant. He abandoned his effort to do so. He had nothing to do with the subsequent negotiations between the Power Company and Frawley, except to suggest and prepare said pretended offer. The suggestion and preparation of the pretended offer was the only service that complainant rendered to the defendant."

"II. That complainant, by suggesting and preparing this pretended offer, came into court with unclean hands and cannot, therefore, recover."

We agree with the Chancellor that the provisions for complainant making an appraisal and determining the town's rights were merely incidental and, that while the examination made may have been properly characterized as cursory, we think it was yet sufficient to enable them to form some safe idea as to the value of the plant, provided it was in a condition or the respective rights such as that they could safely assume an attitude of hostility or defiance to the Tennessee Electric Power Company to which they

wanted to sell it, and which was operating the plant at the time on terms thought to be disadvantageous to the town. This information as to the right to compel this public service corporation to furnish electricity upon equal terms was obtained by writing to an officer of the Utilities Commission, at the trifling expenditure of a few stamps and the use of a little paper, and the negotiations were opened. While we think the first rounds of the effort by reason of the offensive letter of July 8, 1925 that complainant addressed to the prospective purchaser resulted in rendering him persona non grata to the Tennessee Electric Power Company, its dynamic character served to open the eyes of the company to the fact that somebody had a more adequate idea of the value of the plant than the one who had made them the offer, though afterwards withdrawn, to sell it for ten thousand dollars. As a sample of the ethics first adopted, we insert the letter, as follows:

"811 Power Building,
Chattanooga, Tenn.
"Tennessee Electric.Power Co.,          July 8, 1925.
"Chattanooga, Tenn.
  "Attention Mr. E. D. Reed,
  "Manager Chattanooga District.
"Dear Mr. Reed:
  "I have not as yet received a reply to my letter of June 22nd requesting a proposal for the East Ridge distribution system either from you or Mr. Shepherd.
  "The reason, as explained to Mr. Shepherd, I have asked a proposal from you rather than asking the Mayor and Commissioners of East Ridge to submit a proposition is because you are in a position to know just what the property is worth, both replacement value and as a source of revenue, and your authority and responsibilities are fixed and definite. On the other hand the Mayor and Commissioners are not familiar with the lighting business, do not know the values and any proposition they submit which is accepted by you will be criticized because they did not ask for more.
  "What is desired is a fair, reasonable proposal based upon actual values but is apparent that it is not your intention to submit one. I might say that the Power Company does not stand in good favor with the people of East Ridge because up to the present time it has been impossible to get you to come out in the open in this matter and deal with them in a fair and businesslike manner. It is apparently not your desire to pay a fair price for the property but to 'get it.' So far your policy has worked very successfully in enabling you to

utilize their system for the past three years free of charge and you almost succeeded in 'getting it.'

"The logical solution of course is for the Power Company to take over this property and I believe everyone appreciates that fact but unless you wish to see the system go into the hands of others from whom you will acquire it at a premium if at all, I would suggest that you change your tactics.

"I am quite sure that you will receive no proposal from the Town of East Ridge. Yours very truly."

The effect this letter had upon Mr. Reed and the Power Company is disclosed to us by Mr. Frawley, who testified:

"Q. Now another thing he agrees to do in this contract, is to negotiate with the Tennessee Electric Power Company or others, for the sale or rental of this distribution system to the best advantage to the city of East Ridge; what success, if any, did Mr. Christians have in his negotiations with the Tennessee Power Company with respect to a sale to them of the distribution system over there? A. None whatever. Q. He was unsuccessful in that? A. The facts are that he wrote to Mr. E. D. Reed a letter, and Mr. Reed met me down town in the Hamilton National Bank and told me he had received a communication from Mr. Christians, and that he ought to have gone up there and spit in his face and kicked him out of his office. That is what he told me. I immediately saw there was no use to try to deal with Christians and the Tennessee Electric Power Company from that conversation. Q. I will ask you to state whether or not Mr. Reed or some other official of the Company told you that they would not negotiate with Mr. Christians? A. That conversation was later on, and away a long time after, when we were talking in Mr. Shepherd's office, Mr. Reed and Mr. Shepherd, their lawyer, they said they did not want Christians' name even to be known in it."

He also stated that this power system they were trying to sell had been built by the city under a bond issue, at a cost of $25,000.

From the sequel we disagree with the witness that the negotiations culminating in the first stages by this letter were without effect, and we disagree with the Chancellor that they were abandoned. They were not abandoned. They only changed form, and Mr. Christians merely retired into the background to renew the attack through Mr. Frawley, the mayor, regarding which the mayor himself testified:

"Q. Now reverting to the matter of the negotiations for the sale; with regard to the Tennessee Electric Power Com-

pany, state whether or not you had a conversation with Mr. Christians after he had attempted to negotiate with them, in which it was agreed between you and him that he could not do anything further with regard to the system? A. Yes, sir. Q. State if any suggestion was made by Mr. Christians with regard to some counter offer? If so, what was it? A. He and I discussed that pro and con, that was late as we went along with the business, and he said that he would draw up a contract, and that he would make an offer, if I recollect correctly, for $35,000—no, I don't think he said that amount, but that he could arrange to pay $5000 down, and $5000 per year, I think that was the understanding, and then later on he brought me a contract for $35,000. Q. Just a minute; you say you think; did he bring you a contract for some amount? A. Yes, sir. Q. In legal form? A. Yes, sir, he brought me a contract for $35,000. That was the amount of it. I told him, I said 'Christians, this won't do, you had better make this $30,000;' so he took back the contract and said 'all right,' I will make that change with it, and he took it back and brought me another one for $30,000. He said he could not just change the figures, but would have to change the whole thing, and he had that wrote out. Q. Have you got that offer? A. I think I have at home. Q. I will ask you to file that as an exhibit to the original, if you can get it, but if not Mr. Christians says he has a copy. A. Yes, sir, he brought that contract for $3,000 ($30,000)? I don't remember exactly how the payments were, I think about $5,000 per year. In other words, he was to make it out of the line and pay $5,000 per year and take care of the bonds. Q. Then it was understood that was not an offer in good faith? A. Well I should say not. Q. He didn't intend to actually pay for the plant, but it was given for the purpose of getting an offer out of the Tennessee Power Company? A. In a way, yes, sir.''

He then went on to explain the negotiations agreed on thereafter culminating in the offer of $25,500, on which amount the commissions are claimed at seven and one-half per cent.

Complainant's testimony as to these after negotiations is as follows:

"Q. Did you ever go to see the Power Company after writing them the letter that you have just filed as Exhibit E? A. I did not in reference to this business. Q. Why? A. Because the tone of the letter was such that I did not think it would be of any use to go to see them any more. Q. Did you talk again to Mayor Frawley about the matter? A. I did. Q.

What was decided upon? A. It was decided to wait awhile, of course, until they had had time to digest this letter, and make their necessary arrangements, then it was decided that I should put in a bid for the distribution system, and the bid was prepared for that purpose. Q. Did Mayor Frawley go to see the Power Company thereafter? A. He did. Q. At the time you decided not to approach them, did Mayor Frawley agree, or not agree, in regard to such course? A. He did agree that I should not approach them. Q. Did you confer with Mayor Frawley after he went to see them? A. I did. Q. What offer did he receive from them? A. $25,000 I think was the first one. Q. Did he receive a later offer? A. He did, yes. Q. Do you know the amount? A. $25,500. Q. Was this offer accepted? A. It was."

It is true he denies that he approved of it. He did not at the start, but later on, somewhat under compulsion, Mr. Frawley says he did agree to it.

These negotiations brought the matter to a head, resulting in a sale of the plant. Mr. Frawley, to his credit, seemed a little reluctant to confess to the subterfuge, and in a half hearted way he claimed it was a genuine offer, but had to admit that it was gotten up for the ulterior purpose, and the evidence shows he used it effectively in closing the sale to the Power Company. Mr. Christians boldly admits it to be the child of his own invention, and, following the illustrious precedent contained in a certain citation in the briefs, claims it of no more consequence than just trade talk.

We are of opinion that, stripped of any question as to whether or not equity will lend him its aid in the enforcement of rights earned in a way that no high minded person could approve of or emulate, in the employment of falsehood and subterfuge, we yet think the proof shows that he would otherwise be entitled to a decree for $1,000, which Frawley said he agreed to before he would permit the ordinance validating the trade that had been made with the Tennessee Electric Power Company to pass its third reading. There is no doubt but what complainant demurred to closing the deal with the company at the price of $26,500, thinking they could obtain more; but Frawley, who had obtained the offer through a dramatic pretense of carrying out the subterfuge proposition, testified that he did agree to it finally, though reluctantly; and, contrary to the opinion of the Chancellor, we think the weight of the proof is that complainant did so agree. In regard to this feature Mr. Christians testified:

"Q. Now Mr. Christians, sometime between the passage of the ordinance of acceptance on its first reading and its passage on its third reading, you had a conversation with Mr. Frawley? A. I did. Q. At that time you understood the offer that he had of $26,250? A. I did. Q. And Mr. Frawley told you whether or not that offer was accepted on behalf of the Town of East Ridge would be dependent upon whether you were willing to accept $1000 as your commission? A. We argued there for several hours. I tried to get him to turn it down. He said he was afraid to turn it down; that he didn't know what to do about it; at that time I told him that my contract was fair when we made it, it was still fair, and I would have to stick to it; and at the end of the conversation, which lasted as I say a long time, I told him it was entirely up to him to go ahead, it was none of my business, I could not stop him anyhow. Q. And he told you at the time that he would refuse to pass the ordinance on the third reading unless you agreed to accept $1000? A. He did. Q. He did? A. Yes, but I did not accept the $1000."

He here admits that while he told him to go ahead, that both propositions were submitted together, and he was wrong about not being able to stop him and prevent the consummation of the deal at that time and upon those terms. His contract was yet in force, and while under its terms he could not himself have closed any deal without an acceptance by the board, neither could they have closed any deal without his consent. Had he insisted upon it the only alternative the city could have had would have been to defeat the ordinance of acceptance, and then have taken steps under the terms of the contract to terminate it, which could not have been done under sixty days after notice.

Mr. Frawley, after explaining to some extent as to what the argument had been with reference to the ordinance, was asked:

"Q. It passed three readings? A. Yes, sir. Between the second and third reading Mr. Christians and I had it backwards and forwards two or three times. So I said to Mr. Christians at my house, I said: 'Mr. Christians, this ordinance will come up Monday night—I think this was Thursday or Friday morning—this ordinance will come up for the third and final reading Monday night, and I want to say this to you, that if you don't accept this $1000 before Monday night, I am going to kill the thing on its third reading, now its up to you.' So Mr. Christians come out to my house, I think it was on Friday or Saturday morning, and we had it up and talked about it, and he says: 'I still don't think you are getting

enough for the power line.' 'Well,' I says, 'what about this other thing; that is what I want to get out my system, are you satisfied with $1000, if not I am going to kill this ordinance.' 'Well,' he says, 'I have concluded to let it go on, just let it go on.' That is the remark he made, and I said 'alright,' and I thanked him for it. The ordinance was passed on third reading Monday night, and Mr. Christians was in my house on Tuesday. Q. Just wait a minute.' Was he there the night it passed? A. Yes, sir, he was there. Q. Tell about any conversation you had with him at that time. A. On the night it passed the third reading, after the meeting adjourned I saw Mr. Christians sitting over against the wall, and I said: 'Hello, Christians, come over here;' we were on this side, and he was on that side; I think Mr. Brotbeck, Mr. Harris and I, I do not know who else, and Mr. Christians got up and walked over, and I said 'we sure owe Mr. Christians a vote of thanks for accepting $1000 for the work he did on this proposition;' just what remark he made I do not know, we were talking.''

He then testified that it was either on Tuesday or Wednesday morning that Mr. Christians came out to his house, walked up there and pulled out a letter and handed it to him, which he opened and read, and said: ''It took me clear off my feet when I got done and saw the amount he had down that East Ridge owed him. I turned around and looked at him, I says,' what the —⟍— does this mean,' and he says 'I am just putting a little fly in the ointment,' and I says '———! if that is the way you feel about it, to show you what contempt I have for you I will throw the offer on the ——— floor,' and pitched it off like that. (Indicating.) So he looked at me, and I says, 'I ——— you have bought you a lawsuit.' Of course he could sue on it. That is about all the conversation there was. I says 'I ——— I thought I was dealing with a gentleman, but I find out I was not.'

''Q. Mr. Frawley, I will ask you what it was about his remark that provoked you to profanity? A. Simply that I had every confidence in the world in him, and Mr. Christians knows in his heart that I was under the absolute impression that he had agreed positively to accept $1000 for his services, and then coming out and handing me a bill for nineteen hundred and some odd dollars, I think it was, and of course knowing that I didn't have only my word against his word, in regard to that thing, of course, I realized I had been duped, that is all, and of course it was bound to have nettled me.''

In addition to his word Mr. Frawley has upon his side a winning psychology. While Mr. Christians denied that he agreed to ac-

cept the $1000, and that if Mr. Frawley stated that they were due him a vote of thanks by his agreement to accept $1000, that he did not hear it, he did not go back on the stand and deny the circumstantiality of the case made by the testimony of Mr. Frawley, which left a question as to whether or not he had agreed to accept $1000 a matter of construction by him, with reference to which he might have thought that the assent which he gave to going ahead and closing the deal at that price did not involve assent as to the amount of the compensation he was to receive, which was coupled with it.

We think the record sufficiently corroborates Mr. Frawley. Why should the payment of an amount for which Mr. Frawley wanted to give him a vote of thanks for being willing to accept occasion any "fly in the ointment?" Mr. Christians knew that the presentation of a bill larger than what he had agreed to accept, and which reduced the amount below what the system had cost the town, a circumstance which they had all tried to guard against, and which had been practically guarded against if Frawley is to be believed, would create a "fly in the ointment." We think Frawley's apprehension about described what was in the complainant's mind; which was, that he had a contract which, together with the sale price, would fix the amount. The burden would be on Frawley to establish the agreement modifying the contract in this particular, and he started to brazen it out with the suggestion of a "fly in the ointment." Frawley had deceived himself; the tactical situation would be with the complainant. But Frawley's righteous indignation, as contrasted with complainant's cool perfidy, shows that he is not quite so schooled in Machiavellian philosophy as that there may not be some hope of a withdrawal by Frawley from "ways that are dark and tricks that are vain" before the good standing evidenced by his official position may be destroyed. At any rate we believe that complainant's assent to the reception of $1000 was effectually established, and if he is entitled to the aid of this court in recovering anything, that sum would measure the amount he is entitled to.

The original contract was legitimate and the services contracted for worthy, but there can be no doubt from this proof that in carrying it out and effecting the sale to the Electric Power Company both the complainant and the Mayor (who had no personal or pecuniary interest in the sale), resorted to subterfuge and conspired to deceive the Electric Power Company, and so worked upon its fears as to a competitive danger as to cause it to be willing to buy the distribution plant, though it does not appear that it was their purpose to exact a larger price than the plant was

worth. Nor does it appear that the Electric Power Company was in anywise injured, or induced to pay more for the plant than it was really worth. It would rather appear that, due to the vigorous though somewhat unscrupulous methods employed, they were induced to pay somewhere near the value of the plant, and that the lie which tainted the negotiations with the Electric Power Company and doubtless deceived it as to an active competitor, only caused it to do a lawful act which is not shown to have been to its disadvantage, except that we might speculate, if it had held off, it might not have gotten the property cheaper, to the disadvantage of the town. However, we cannot escape the conclusion that the success of the trade was the reward of the iniquity practised, and that its nature was such as to inoculate the foundation of complainant's claim with uncleanness. We think it is apparent there would have been no commissions to sue for but for the deceit and finesse with which the trade was accomplished. In C. J., Vol. 21, sec. 174, it is stated that:

> "In the absence of any equity arising against plaintiff, the general rule is that the misconduct must be so connected with the subject matter as to affect the equitable relations with the parties; but there are many cases where relief has been refused, although defendant was not concerned in the plaintiff's conduct, as in the cases already considered of similar but distinct misconduct on the part of plaintiff, and cases of frauds upon third persons."

Apropos of the last sentence, complainant insists that the act was of such character that it did not amount to a fraud, but was merely "trade talk;" and cites a number of cases under which he insists that, as there were no confidential relations, and no misrepresentations as to value of the distribution plant, regarding which it was insisted that the Electric Power Company was better informed than all of them, that his action was not such, notwithstanding the falsehood as to an eager competitor, as would tincture the trade with invalidity. In other words, that it was a harmless misrepresentation of which the Electric Power Company could not successfully complain, as it merely stimulated expedition and a willingness to purchase at a fair price, if it had any effect at all.

With reference to this insistence, it does not seem to be essential to the stain that injury in such case may have resulted. Under section 165 of C. J., Volume 21, cases are cited as holding that:

> "The misconduct need not necessarily be of such a nature as to be punishable as a crime, or actually fraudulent, or constitute the basis of legal action." That:

"Any willful act in regard to the matter in litigation which would be condemned and pronounced wrongful by honest and fairminded men, will be sufficient to make the hands of the applicant unclean."

In the case of Overton v. Lewis, 102 Tenn., 500, 507, 511, it was held that one purchasing a car at the suggestion of one with whom he had had immoral relations, and leaving it in her garage under agreement that her husband teach him to drive it, was entitled to replevy same as against the contention that complainant did not come into court with clean hands, the car not having been used or connected with the improper or immoral conduct of the parties.

Of course, stripped of any conclusion that the car was placed in possession for the purpose of being used to further the immoral relations, it would appear that it had no connection therewith, and it should be axiomatic that disconnected moral obliquity should not be regarded as disqualifying a suitor. For while we venerate the high and holy standards of the Christian religion which many profess, we yet realize the perfection therein portended is not to be attained through the conventional standards that are still suffered because of the hardness of the hearts of those who yet persist in sufficient numbers to prescribe a lower standard for their material government. For this reason church and state was separated in the days of Samuel, and the people allowed to chose their king, lest they become defiled by the physical enforcement of a higher standard to which their spiritual status did not give its assent. The king in most places is now the law that has been written, and must still control its ministry. But conscience has achieved for itself a status where it can balk against its own defilement by becoming a participant in a scheme for emolument it cannot sanction as worthy. In the investigation of this most delicate subject there appears to be a great diversity of views, and the difficulty is to find any certain test as a guide to solution. Attempts have been made, but they have not always been attended with any unanimity of opinion.

In the case of West v. Washburn (1912), 153 App. Div., 460, 138 N. Y. S., 230, referred to approvingly in the case of Overton v. Lewis, supra, it was said:

"While equity does not employ itself in settling quarrels among rogues, still a rogue may have a 'clean cause of action,' and it may be safely said that our court has distinguished sufficiently between the actor and his cause."

The case of Goodwin v. Hunt, 3 Yerger, 124, also referred to and approved, distinguished the cause from the actor and held that the

stain incurred in his efforts to enforce it did not repel him. The court said, in relation to the two receipts which apparently complainant had forged to evidence payment of the instrument which the bill sought to have declared a mortgage and cancelled:

"Considering them as forgeries, the defendant's counsel insists that however acquired the complainant may have made out his case by other unexceptional testimony, yet because of the iniquity connected with these receipts he is not entitled to equity. That would be a very strained application of the rule. If a complainant's cause of action originates in iniquity, although he may have the right, as against his antagonist, the court of chancery will turn him out without relief, because it will not give its aid to the establishment and enforcement of a right so stained with sin. But if in the establishment of a fair, clear and honest right a complainant in relation to some of its proof may be guilty of misconduct, independently of which there may be unexceptional evidence abundantly sufficient to establish the fairness and honesty of his claim, the court will not, on account of such misconduct, refuse relief."

In the case at bar the sin of the complainant affected the cause of action, but being accompanied with no injury to anyone (which is an essential element of a legal or actionable fraud), it is insisted that it should not have the far-reaching effect that some of the cases as heretofore indicated would imply. This position would seem to have support in the text section 174 of C. J., Vol. 21, page 188, where it is said:

"In the absence of any other equity arising against complainant, the general rule is that the misconduct must be so connected with the subject matter as to affect the equitable relations between the parties,"

and many decisions from numerous states are cited as supporting it, among them that of Bradley Co. v. Bradley, 165 Calif., 237. The facts in this case were that a conveyance had been made upon a parol trust, in order that money might be borrowed by the trustee to improve the property, conditions being such that the owner did not desire to be known as a borrower. It seems that in order to get the money the parol trustee had to make an afffidavit as to ownership, or as to anyone having an interest in the land, and in doing so, with the knowledge and acquiescence of the real owner, she omitted any reference to his name in the affidavit; and when the owner sought to have her convey she refused, and the defense to his bill was unclean hands in the matter of the affidavit. The court said:

"But whatever judgment may be placed upon Richard Bradley's conduct in the forum of good morals, it was not a fraud of which law or equity takes cognizance. It was not designed to injure anybody. In fact it injured nobody, least of all respondent, who seems to see in it rather an opportunity to make use of it to her advantage. It is not every wrongful act, nor even every fraud, which prevents a suitor in equity from obtaining relief. His misconduct must be so intimately connected to the injury of another that the matter for which he seeks relief has to make it inequitable to accord him such relief. It must have been conduct which if permitted inequitably affects the relationship between the complainant and the defendant, nothing of which is here shown. Suffice it for this to make reference to 1 Pomeroy Equity Jurisprudence, section 399."

This case bears quite a resemblance to the case at bar, and would seem to be authority for the position of complainant; for in order to carry out a lawful purpose Bradley connived at a falsehood, which, if it was not perjury, bordered so closely thereon as to be difficult to distinguish it therefrom. But this case added as necessary to a disqualification, injury which affected inequitably the relations between the complainant and defendant. However, it seems to us it does not take into account any defilement which a court of conscience would itself incur by lending its aid to invest the delinquent with the fruits of his iniquitous scheming, and condones the offense upon a consideration that it might have been more perfidious or injurious in its effects than it was.

Without reference to other disqualifications we think our own court in the case of Goodwin v. Hunt, supra, announced a safe and proper rule, free from any modification of convention that would reduce conscience to formula, when it said:

"If complainant's cause of action originates in iniquity, although he may have the right as against his antagonist, the court of chancery will turn him out without relief, because it will not give its aid to the establishment of a right so stained with sin."

In the case of Anderson v. Upchurch, 52 S. W., 917, Judge Neil, then a member of the Court of Chancery Appeals, while holding that the question was not involved simply by the expression of an intent to do a wrong that was not executed, gave utterance to what is believed to be a correct and forceful expression of conditions which should hedge a court of conscience in these words:

"The rule concerning unclean hands has quite a wide application, but not wide enough to be used merely as means of punishing a complainant for wrongful, immoral or illegal acts he may have committed with regard to the subject matter concerning which he seeks relief. Nor at all with regard to such matters when they are purely collateral to the grounds of relief sought, and the enforcement of such relief does not in anywise involve the court in such wrongful acts, or place the court in the attitude of furthering such wrongful purpose or plan."

These two cases from our own courts furnish a chart for the guidance of enlightened conscience, and are supported upon a foundation of what can and should be regarded as a sound public policy of promoting honesty and fair dealing, and of discouraging subterfuge and trickery. Conscience does not defile itself in sanctioning the enforcement of a just and clean cause of action, even though attempts may have been made to improperly influence its favor; but when it actively interposes its aid to secure the fruits of unfair and unscrupulous dealing, it becomes a party to the scheme and encourages the practice of devious ways that corrupt the place of its habitat.

What is a court of conscience? It is not simply a tribunal to enforce conventional rules, though it must follow and will not subvert the law. It is the palladium of a living sensitiveness to that righteousness that is itself the product of the highest spiritual culture. It has entrenched its jurisdiction in the governments of men as a monumental testimonial that men cannot live tolerably without God; for conscience is the witness of His presence in their affairs; and He still stands above their conventional systems, which he ordains and tolerates, while beckoning them to larger vision and more just relations. Shall this high court therefore be required to prostitute its agencies to the recovery of the fruits of unrighteousness? When it can be required to do so it will cease to be a court of conscience, responsive to the dictates of the highest standards. Transactions so tainted should be relegated to the courts of law, for the consideration of the conventional conscience which the law creates, though it seeks itself, as far as it may, to purge its fountains of all stain.

In the case of Reeves Lumber Co. v. Cain-Hurley Lumber Co., 152 Tenn., 339, a law case, the court applied the maxim ex dolo malo non oritur actio. (A right of action cannot arise out of fraud.)

Counsel for appellee cite in their brief the case of McMullan v. Huffman, 75 Fed., 547, 174 U. S., 639. In that case two competitive

bidders were making bids on a contract. By agreement between themselves one bid was to be lower than the other and they were to be partners in the lower bid, the higher bid being submitted to convince the other party that the lower bid was reasonable and low. The record did not show that the higher bid was really instrumental in effecting the contract on the basis of the lower bid, and for that reason the lower Federal court held that an action could be maintained against one of the parties by the other for a division of the profits. The Supreme Court however, reversed this finding and held that by reason of the fraud recovery could not be had.

A general rule is stated in 10 R. C. L., 390, as follows:

> "Nor will a court of equity, as a court of conscience, tolerate unfairness, inequitable conduct or corruption in a complainant, however strong and clear his equitable right against the other party may be."

On the whole we think the complainant's bill was properly dismissed. The decree of the Chancellor is affirmed, with costs against appellant and his securities.

Portrum and Thompson, JJ., concur.