WATKINS SALT CO. v. MULKEY et al.

(Circuit Court of Appeals, Second Circuit. June 8, 1915.)

No. 254.

1. APPEAL AND ERROR ⟊232—OBJECTIONS IN LOWER COURT—EVIDENCE.

Where defendant, on plaintiff's resting after introducing parol evidence of a contract, moved for a nonsuit on the grounds that the parol agreement was merged in a subsequent written contract and that the oral contract violated the statute of frauds, and the motion was denied, and at the close of the case renewed the motion on the same grounds, and it was again denied, defendant sufficiently objected to the admission of the parol evidence to entitle him to a review on writ of error from a judgment for plaintiff.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1351, 1368, 1426, 1430, 1431; Dec. Dig. ⟊232.]

2. CONTRACTS ☞248—MERGER—QUESTION FOR COURT.

Whether a written contract expresses the agreement of the parties, so that a prior parol agreement is merged therein, is for the court.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1140; Dec. Dig. ☞248.

Merger of contracts, see note to Riedinger v. Diamond Match Co., 60 C. C. A. 6.]

3. EVIDENCE ☞593—SUFFICIENCY—EVIDENCE IMPROPERLY ADMITTED.

A verdict which has for its basis parol testimony varying a written contract cannot stand.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2430; Dec. Dig. ☞593.]

4. EVIDENCE ☞419—PAROL EVIDENCE—WRITTEN CONTRACTS—CONSIDERATION.

The rule that parol evidence is admissible to explain or amplify the consideration recited in a written contract does not permit proof of an oral agreement imposing an affirmative obligation on one of the parties, of which there is no indication in the written contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1912–1928; Dec. Dig. ☞419.]

5. CORPORATIONS ☞406—POWERS OF OFFICERS.

An agreement by the president of a manufacturing corporation to advance money in aid of the reorganization of another manufacturing corporation, to operate and conduct the affairs of the reorganized corporation, and to turn over stock of the reorganized corporation to persons putting up as security the stock of an independent corporation, is not within the implied authority of the president, and a resolution of the board of directors of his corporation, ratifying a proposition submitted by the president to a bondholders' committee of the corporation to be reorganized, which authorizes the president to conclude the transaction, does not confer authority on the president to make a contract to turn over any part of the stock of the reorganized corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1611–1614; Dec. Dig. ☞406.

Authority of president of corporation to contract in its behalf, see note to Marqusee v. Hartford Fire Ins. Co., 119 C. C. A. 256.]

6. CORPORATIONS ☞386— CONTRACTS — RATIFICATION — ULTRA VIRES CONTRACTS.

A corporation cannot ratify an ultra vires contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1554, 1555; Dec. Dig. ☞386.]

7. CORPORATIONS ☞426—CONTRACTS—RATIFICATION.

The ratification by a corporation of a written contract made by its president is not a ratification of a prior parol agreement, not embodied in the written agreement, nor communicated in any way to the directors of the corporation, for there can be no ratification of that of which the ratifying body has no knowledge.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. ☞426.]

8. CORPORATIONS ☞428—CONTRACTS—RATIFICATION.

Where the president of a corporation made a written contract which by its express terms was made subject to the approval of the board of directors, and made another written contract relating thereto which was ratified, and made an unauthorized oral agreement affecting the subject-matter of the two contracts, of which there was no mention or suggestion in the written contracts, his knowledge of the oral agreement could not be imputed to the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. ☞428.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. CORPORATIONS ☞428—ACTIONS OF OFFICERS—ASSUMPTION OF KNOWLEDGE OF MATTERS KNOWN TO OFFICERS.

A corporation cannot in all cases be assumed to have knowledge of all matters known to its president relating to the business of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748-1761; Dec. Dig. ☞428.]

In Error to the District Court of the United States for the Western District of New York.

This cause comes here on writ of error to review a judgment entered upon the verdict of a jury in favor of the plaintiffs below for the sum of $32,627.50.

The Watkins Salt Company is a corporation created, organized, and existing under the laws of the state of Delaware, but is engaged in business in the state of New York, and has its principal office and place of business at Watkins, in the county of Schuyler and state of New York. Warren W. Clute is a resident of Watkins, Schuyler county, N. Y., and is president of the Watkins Salt Company. The defendants, who were plaintiffs in the action below and will be hereinafter referred to as plaintiffs, are citizens and inhabitants of the state of Michigan. The plaintiffs in this court, who were defendants in the court below, will be hereinafter referred to as defendants. On the trial below, and at the close of the case, the complaint was dismissed as against Warren W. Clute, there being in the opinion of the court a lack of evidence as against him.

Hubbell, Taylor, Goodwin & Moser, of Rochester, N. Y. (John G. Milburn, of New York City, and Clarence P. Moser, of Rochester, N. Y., of counsel), for plaintiff in error.

Gibbons & Pottle, of Buffalo, N. Y. (Frank Gibbons, of Buffalo, N. Y., and H. A. Lockwood, of New York City, of counsel), for defendants in error.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This action was brought to recover damages arising out of an alleged breach of contract to deliver to plaintiffs a certain amount of the capital stock of a reorganized salt company, named the Detroit Rock Salt Company. It appears that the Detroit Salt Company, a corporation existing under the laws of Michigan, was manufacturing salt from brine obtained from wells on its premises; but the company was not operating to advantage and had given a mortgage on all the property it owned, the mortgage running to the Security Trust Company as trustee, a Michigan corporation having its office at Detroit. The mortgage was given to secure the payment of bonds issued by the Detroit Salt Company in the amount of $1,000,000. The company was also indebted to divers persons upon notes and open accounts in the amount of $325,000. A suit had been instituted to foreclose the mortgage, as the Detroit Salt Company was in default, and the Security Trust Company had been appointed receiver to take and hold possession of all the property during the pendency of the suit to foreclose the mortgage. After the foreclosure suit was begun the holders of the bonds secured by the mortgage appointed a committee of nine and authorized it to take all proceedings deemed necessary or proper to protect the interests of

the bondholders, including the power to purchase or cause to be purchased in behalf of the committee the property of the Detroit Salt Company, and to reorganize that company or to organize another corporation for the purpose of taking over and operating the property of the Detroit Company.

The bondholders' committee had certain negotiations with the Watkins Salt Company, defendant herein, who was represented by its president, Warren W. Clute. As a result of the negotiations with the bondholders' committee, and of the separate negotiations which took place between the plaintiffs and the Watkins Salt Company, the latter company on June 12, 1912, submitted in writing to the bondholders' committee a plan of reorganization of the Detroit Salt Company. The plan proposed was that the bondholders' committee should proceed with the pending foreclosure proceedings, bid in the property, organize a new company, issue $1,000,000 first mortgage bonds payable in 20 years, $1,500,000 of common stock, and $219,000 of preferred stock, and that the committee, with the new bonds and the preferred stock, should cause to be paid and canceled all of the old bonds, use $325,000 of the common stock to pay the outstanding indebtedness, and then turn over the balance of the common stock to the Watkins Salt Company as its property. The Watkins Salt Company on its part was to make an advance not to exceed $100,000, out of which was to be paid the cost of the receivership, existing liens, expenses of foreclosure and of the bondholders' committee, the expenses of forming the new company, etc. The proposal was accepted by the bondholders and was fully performed.

On August 2, 1912, another written agreement relating to the reorganization of the Detroit Salt Company was made. This agreement was not with the bondholders' committee, but with the plaintiffs herein on the one side and the Watkins Salt Company on the other. The agreement recites that in consideration of the advancements made and to be made by the Watkins Salt Company towards the reorganization of the Detroit Salt Company, at the request of and for the benefit of the parties of the first part, the parties of the first part have agreed to pledge as collateral security for such advancements the entire capital stock of the Detroit & Western Railroad Company. It further recites that the stock is deposited "as collateral security for the repayment to the party of the second part of all moneys now or hereafter advanced by it for or on account of the reorganization" of the Detroit Salt Company. It gives the party of the second part "a lien for all advancements heretofore or hereafter made, not exceeding" $100,000, and gives it also the right to sell the deposited stock at public or private sale and without notice of time and place of sale. It contains other provisions which it is unnecessary to set forth. In explanation of this agreement of August 2d it is to be said that the plaintiffs, "the party of the first part," were stockholders in the Detroit Salt Company, and that one of them, Jennings, was a member of the bondholders' committee and its secretary, and took a very active part in inducing the president of the Watkins Salt Company to submit to the bondholders' committee the proposal already referred to of June 12th, and that the

promise of Jennings that this stock should be deposited as collateral in the manner specified in the writing of August 2d had been made prior to June 12th, and was one of the considerations which led the president of the Watkins Salt Company to submit the proposal of the latter date. The plaintiffs owned all the stock of the Detroit & Western Railroad Company. That railroad was a very small affair. The company owned two cars and an engine and two miles of track. It was located in Detroit, and connected the Wabash Railroad with the Michigan Central Railroad. It was built to carry salt from the mines to the railroads and to bring coal from the railroads to the mines. Without the operation of the mines the railroad was practically valueless. It was worth between $50,000 and $70,000. Jennings testified that he had all his fortune invested in the mine and the railroad and that his last dollar was involved in the reorganization of the salt company.

The agreements of June 12th and of August 2d are of value here as a part of the history of this transaction. The right of action which the plaintiffs assert does not grow out of either of the two written contracts to which reference has been made. It grows out of an alleged oral agreement which the plaintiffs assert they made with Warren W. Chute as the president of the Watkins Salt Company, and which they claim created an obligation on the part of that company to surrender to them 49 per cent. of the stock issued by the Detroit Rock Salt Company, less the amount it was agreed should be paid to unsecured creditors of the Detroit Salt Company. It is conceded that, if such an agreement was ever made, it rested in parol, and that it was made prior to June 12th, when the first of the two written contracts above mentioned was adopted. The court below admitted parol testimony to prove the existence of such an oral agreement. The defendant insists that the evidence was inadmissible, and under the circumstances of the case insufficient to support the judgment which the plaintiffs obtained. It claims that the written contracts must be conclusively presumed to contain the whole of the engagement of the parties, and that the written contracts cannot be altered, added to, or varied by oral evidence. The plaintiffs, while conceding the general rule to be as defendant states it, nevertheless assert that the rule is inapplicable to the circumstances of this case.

[1, 2] The plaintiffs insist that, as the oral evidence was received without objection, the question as to its admissibility cannot be raised in this court, and that the parol agreement must be taken as established by the verdict of the jury. It appears, however, that when plaintiffs rested the defendant moved for a nonsuit on the ground, among others, that the alleged oral contract, if any, and all conversations in reference to it, were merged in the writing of August 2, 1912, and also on the ground that the oral contract violated the statute of frauds, because it was an agreement for the sale of personal property of the value of more than $50. The motion was denied.

Whether the written contract of August 2, 1912, expressed the terms of the agreement was a question for the court, and should not have been submitted to the jury. Seitz v. Brewer's Refrigerating Co., 141 U. S. 510, 517, 12 Sup. Ct. 46, 47, 35 L. Ed. 837 (1891). And in the

case cited the Supreme Court, through Chief Justice Fuller, stated the law as follows:

"Undoubtedly the existence of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms, may be proven by parol, if under the circumstances of the particular case it may properly be inferred that the parties did not intend the written paper to be a complete and final statement of the whole of the transaction between them. But such an agreement must not only be collateral, but must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. And when the writing itself upon its face is couched in such terms as import a complete legal obligation, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and the manner of their undertaking, were reduced to writing. Greenl. Ev. § 275."

At the close of the case and on the same grounds the court was asked to direct a verdict for the defendant, which was refused. In view of these facts there is no substance in the argument that the oral agreement was received in evidence without objection. Loomis v. N. Y. C. & H. R. Co., 203 N. Y. 359, 367, 96 N. E. 748, Ann. Cas. 1913A, 928 (1911).

[3] The agreement as to the stock of the reorganized company, if any such agreement was actually made, and we express no opinion as to whether it was or not, was so closely connected with the transfer of the stock of the Detroit & Western Railroad Company that it cannot properly be regarded as relating "to a subject distinct from that to which the written contract applies." To admit proof of an agreement to turn over the stock of the reorganized company in case the railroad stock was deposited as collateral would be to add another term to the written contract contrary to the well-settled and salutary rule governing such cases. And no verdict can be permitted to stand which has its only basis in parol testimony which should never have been admitted.

[4] Counsel for plaintiffs seek to justify the admission of the evidence upon the plea that the parol contract really constituted a part of the consideration of the written agreement of August 2, 1912, and that the matter of consideration is always open to inquiry by parol and capable of oral proof as to just what it may be. It is true that for some purposes parol evidence can be introduced to explain or amplify the consideration recited in a written contract; but this exception to the general rule does not permit proof of an oral agreement for the purpose of imposing an affirmative obligation on one of the parties of which there is no indication or suggestion in the written contract. If that were to be permitted on the theory of an inquiry into the consideration of the contract, the rule respecting the finality of written contracts would obviously be abrogated. This was clearly stated in Howe v. Walker, 4 Gray (Mass.) 318 (1855), when the court said:

"Nor can you, under the guise of proving by parol the consideration of a written contract, add to or take from the other provisions of the written instrument. This would practically dispense * * * with that sound rule of the common law which finds in the written contract the exclusive and con-

clusive evidence of the intent and agreement of the parties, and will not suffer such written contract to be varied or affected by any contemporaneous parol agreement."

[5] There is, however, another reason why it is impossible that the plaintiffs should succeed in their action. The oral agreement upon which they rely was made by them, if their testimony is true, with the president of the Watkins Salt Company. The agreement was of an unusual and extraordinary character. It may even have been ultra vires in its character, although we do not find it necessary to consider that phase of the subject. It was an agreement by a manufacturing corporation to advance money in aid of the reorganization of another manufacturing corporation and to operate and conduct the affairs of the reorganized company. It was agreed by way of inducement and to secure the money advanced that the stock of an independent company should be put up as security, and that in return stock in the reorganized company of the par value of $410,000 should be turned over to these plaintiffs as their absolute property. Certainly it is not within the implied authority of the president of a corporation to enter into any such agreement. We have searched the record in vain for the purpose of finding that the board of directors of the Watkins Salt Company ever expressly authorized its president to make any such agreement as to the stock of the reorganized company. The resolution of the board of directors adopted on June 20, 1912, which ratified the proposition submitted by the president to the bondholders' committee, and which authorized the president "to conclude the transaction as outlined in such proposition," certainly conferred no such authority, for the proposition as outlined made no allusion, even the most remote, to the turning over of the stock or any part of the stock to these plaintiffs. Moreover, the contract that he was authorized under that resolution to consummate was the contract with the bondholders' committee, and cannot possibly be construed as conferring authority upon him to enter into a contract with other parties and upon a subject not submitted to the directors.

[6, 7] It is also plain to us that the Watkins Salt Company cannot be held subsequently to have ratified the unauthorized contract. If the contract was ultra vires and beyond the powers of the corporation to authorize, it would be beyond the powers of the corporation to ratify. But, waiving that, there is no evidence in this record of any ratification of the alleged oral agreement, the written contract of August 2, 1912, does not appear to have been adopted by any specific resolution of the directors. That contract was ratified by the board on November 12, 1912, when it adopted a resolution authorizing the president, Mr. Clute, to sell "as he may see fit, and for such prices and upon such terms as he may see fit," the stock of the reorganized Detroit Salt Company and all collaterals pledged therewith. But this ratification of the contract of August 2d surely cannot be construed as extending beyond the contents of that contract. The ratification of the written contract bearing date of August 2d cannot by any process of legal reasoning be understood as a ratification of the oral agreement

of June 12th not embodied in the written agreement and never communicated in any way to the directors. There can never be ratification of that of which the ratifying body has no knowledge.

[8] But we are told that as the president of the Watkins Salt Company, who is alleged to have made this oral contract, knew of it, it must be assumed that his board of directors had knowledge of it. The proposition stated in detail is this: That when the president of a corporation makes a written contract which by its express terms is made subject to the approval of its board of directors, and makes another written contract related thereto which is ratified, and makes an unauthorized oral agreement affecting the subject-matter of those contracts, of which there is no indication, suggestion, or mention in the written contracts, his knowledge of the oral agreement is to be imputed to the company. We find ourselves unable to assent to the proposition. There is no evidence in the record to show that the president ever communicated the alleged oral agreement to the board, and when defendant at the trial offered evidence to show that it had never been in any way brought to the board's attention, it was excluded.

[9] A corporation cannot in all cases be assumed to have knowledge of all matters known to the president relating to the business of the corporation. Whether such assumption can be indulged seems to turn largely on the particular facts of each case. Cook on Corporations, vol. 3, § 727, p. 2588.

But no one should seriously contend that if a president of a corporation makes an unauthorized contract, which, if valid, would affect the rights of his corporation, his knowledge of the transaction is to be imputed to the corporation, or that it is to be presumed, in the absence of any evidence to the contrary, that he communicated his unauthorized act to his board of directors. The mere statement of the proposition, it seems to us, carries its refutation upon its face. If that were the law, then, as notice to the corporation would begin from the time the unauthorized contract was made, six months thereafter, although the directors had no actual knowledge of its existence, the contract would become valid and binding, not having been disaffirmed by the board. We say six months, because the Supreme Court has held that, unless a board of directors dissents within a reasonable time after it has notice of an unauthorized contract made by its president, it is presumed to have ratified his contract, if the contract is within the corporate powers, and that a delay of six months in the disaffirmance after knowledge of his act is an unreasonable delay. Indianapolis Rolling Mill v. St. Louis, Fort Scott & Wichita Railroad Co., 120 U. S., 256, 7 Sup. Ct. 542, 30 L. Ed. 639 (1886). "After knowledge of his act" can only mean after actual knowledge of his act. But the ruling of the court below means that the president does not need to communicate the facts, that it may be presumed that he has done so, and that the presumption is conclusive and cannot be rebutted. No other inference from the ruling is possible, as the District Court declined to allow evidence to be introduced to show that the president never communicated the oral contract to his directors.

Judgment reversed.