### JORING et al. v. HARRISS et al.

(Circuit Court of Appeals, Second Circuit. June 27. 1923.)

No. 219.

1. **Evidence ⇐448—Parol evidence not admissible to show understanding of parties to unambiguous written contract.**

Where written contracts are plain and unambiguous, though containing technical trade terms, it is conclusively presumed that the parties meant what the words used mean, and parol evidence is not admissible to show a different understanding.

2. **Joint adventures ⇐5(1)—Party to may sue at law for his share of profits.**

A "joint adventure" is a joint enterprise not amounting to a partnership, and differs from a partnership in that a party to it is not obliged to resort to an accounting, but may sue at law for his share of the profits.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Joint Adventure.]

3. **Joint adventures ⇐4(1)—Parties held not entitled to share in sale other than that agreed upon.**

Where plaintiffs contracted with defendants to furnish and ship cotton to fill orders obtained by plaintiffs, the net profits to be divided, plaintiffs having no ownership in the cotton, their only interest in the joint ad-

venture was in its consummation by delivery of the cotton, and where that was prevented, without fault of defendants, plaintiffs were not entitled to share in the profits of a sale to others.

**4. War ⊛═10(1)—Joint adventure in sale of cotton to Austrians held terminated by Trading with Enemy Act.**

Plaintiffs came to the United States in February, 1917, with orders from Austrian spinners for 10,000 bales of cotton. They contracted with defendants to furnish the cotton and store it in Barcelona, Spain, until the close of the European War, when it was to be delivered and the profits, above an agreed price and transportation and carrying charges, divided between plaintiffs and defendants. Defendants shipped and stored the cotton, but, after the United States entered the war, the government authorities, under Trading with the Enemy Act, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa), which made it unlawful to "carry on, complete or perform" any contract with the enemy, refused to permit the carrying out of the transaction, and defendants sold the cotton to others. *Held*, that the contract having become unlawful was terminated, and that plaintiffs were not entitled to share in any profits made on sale of the cotton.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by William Joring and William Bekker against William Leslie Harriss and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

Certiorari denied 44 Sup. Ct. 37, 68 L. Ed. ——.

Plaintiffs reside in Holland, but were in the United States in early 1917. Under date of 19th February in that year, Frierson Bros., of Houston, Tex., addressed to them a letter of which the material parts are as follows:

"We herewith beg to confirm sale to you of ten thousand bales of American Cotton as follows:

"Terms: Free of charges in warehouse, Barcelona.

"Shipment: March/April from any American port to Barcelona.

"Fixation: Price to be fixed at your call, based upon the actual price at which we cover our May hedges. Price to be fixed not later than May 1st, 1917.

"Weight: Invoice weight to be the inbound weights as ascertained at Barcelona warehouse, less 6 per cent. These weights to be final.

"Carrying charges: There is to be added to the invoice, carrying charges at the rate of sixteen American points per month, or fraction thereof, from the day the cotton is warehoused at Barcelona, until peace is officially announced. All carrying charges after that date, including interest, warehouse charges, insurance, etc., to be for your account.

"Reimbursement: Cash dollars New York, to be paid against invoices and Barcelona warehouse receipts, as soon as peace has been officially concluded, and the seas are reopened for the unrestricted shipment of cotton.

"This letter is written in duplicate, and your acceptance written on the bottom hereof will constitute a complete confirmation of this contract."

Plaintiffs did not signify acceptance as above indicated until they had made an agreement with defendants, which is as follows:

"Memorandum of agreement between Joring & Bekker, native citizens of Rotterdam, Holland, parties of the first part, and Harriss, Irby & Vose, of Oklahoma City, Oklahoma, parties of the second part.

"The parties of the first part have sold to one of their clients 10,000 bales of cotton at 1,300 points on New York May contract, price to be fixed not later than May 1st, 1917; the terms being C. I. F. & 6% Barcelona, payment cash dollars New York against Barcelona Warehouse receipts, immediately

⊛═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

after peace has been declared; the buyers to pay 16 points per month, or fraction thereof, as carrying charges, between May 1st, 1917, and date of delivery of warehouse receipts.

"However, the parties of the first part are to allow a subagent one-third of the difference between 1,000 points on May and 1,300 points on May; said subagent's commission being therefore 100 points and making parties of the first part's net sale price actually 1,200 points on May C. I. F. & 6% Barcelona.

"The parties of the second part are to arrange with the firm of Frierson Brothers to ship the 10,000 bales of cotton to Barcelona, and to carry same in their name until final delivery after peace has been arranged.

"Frierson Bros. are to take up 5,000 bales of March contracts New Orleans, and ship same from New Orleans to Barcelona, and are to take up 5,000 bales of March contracts in New York, and ship same via Savannah to Barcelona.

"Frierson Bros. are to be reimbursed for the cost of said cotton, all freight, handling charges, and insurance thereon, together with all interest and also all differences and commissions in the liquidation of March and May hedges; also for all handling charges at Barcelona, together with warehousing fees, insurances, interests, banking commissions, and all expenses of any nature whatsoever in connection with the purchase, shipment, carrying and financing of said cotton, and in addition thereto Frierson Bros. are to be paid, over and above the said charges, the net sum of $20,000.00.

"The parties of the second part shall eventually render to the parties of the first part a complete and itemized statement of the said reimbursements to Frierson, including the said $20,000.00, which sums shall be charged to the debit side of said statement.

"There is further to be paid to Mr. H. B. Willis, all of the traveling expenses of himself and his wife from Savannah to Barcelona and return, together with their expenses while in Spain, and further a salary of $208.33 per month, from the time Mr. Willis leaves Savannah until he returns to Savannah. There is also to be paid to Mr. Willis the further sum of $7,500.00 for his services.

"All of the above mentioned sums which are paid to Mr. Willis are also to be charged on the debit side of said statement.

"There is to be paid to the parties of the first part the sum of $20,000.00, which sum is likewise to be charged on the debit side of said statement.

"There shall be entered on the credit side of said statement the net proceeds received from the sale of said cotton based on 1,200 points on the final fixation price.

"There shall also be entered on the credit side of said statement the carrying charges collected from the buyers for the period intervening between May 1st, 1917, and the date of eventual delivery.

"There shall further be entered on this statement, on the debit or credit side, as the case may be, any losses or profits accruing through the transferring of exchanges from dollars to pesetas, or vice versa.

"The difference between the total of the debit side and the total of the credit side of said statement shall be divided equally between the parties of the first part and the parties of the second part, the parties of the first part retaining their half and paying to the parties of the second part the remaining half.

"Witness our hands at Oklahoma City, Oklahoma, this 28th day of February A. D. 1917.

"Joring & Bekker, Parties of the First Part.

"Harriss, Irby & Vose, Parties of the Second Part."

Having made the foregoing agreement. plaintiffs on February 28th wrote at the bottom of Frierson's letter "Accepted. Joring & Bekker."

The cotton was purchased by or for account of Frierson and shipped to Barcelona. It was in that city at or very soon after the declaration of war by the United States against Germany on April 6, 1917. On or about 30th June, 1917, Frierson cabled to plaintiffs in Rotterdam that "conditions necessitate immediate resale of cotton and cancellation of contract," etc. Plaintiffs at once objected, demanding to know what made "sale compulsory and at what

price" resale could be made. Further cable messages were exchanged between Frierson and plaintiffs, ending in Frierson asking whether plaintiff's position was correctly understood as requiring "fresh instructions (from plaintiffs) in case conditions stated necessitate cancellation." Plaintiffs agreed that this was their position, on September 13, 1917. Meanwhile the cotton remained in storage at Barcelona.

On October 6, 1917 the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) became effective.

On October 30, 1917, defendants and Frierson Bros. made an application to the "War Trade Board" setting forth the substance of the foregoing, and asked leave, license, or permission to carry out the transaction which they thus outlined in said written application:

"Joring & Bekker came to the United States in February, 1917, with an order from Austrian spinners for 10,000 bales of botton. They contracted with Frierson Bros. who represented Harriss, Irby & Vose in the transaction (see contract) for the purchase of this cotton; shipment March and April, 1917; C. I. F. Barcelona, Spain, delivery and payment to be made as soon as peace had been officially concluded. Joring & Bekker also made a separate agreement directly with Harriss, Irby & Vose (see contract). The cotton is now in Barcelona, Spain, at our expense, the title remaining in Frierson Bros., the beneficial interest being in Harriss, Irby & Vose, no money having been advanced by buyers."

(The first contract above alluded to is Frierson's letter, supra, and the second is the agreement between plaintiffs and defendants.)

On November 12th the War Trade Board refused the application in writing, evidently confirming a prior oral refusal, as on November 10th defendants by cable advised the American Consul at Barcelona that the War Trade Board had agreed to permit sale "only to buyers approved by" the Consul, to whom the telegram was sent. Such a sale was subsequently made to Spanish merchants, and the transaction when liquidated showed a very considerable profit.

Of the transactions beginning at the close of October, 1917, and ending in the sale of the cotton, plaintiffs had no notice; they learned of it in the March following, and through Frierson. Plaintiffs always expressed dissatisfaction with what had been done, and after many protests, of a form thought immaterial, brought this action to recover, as the complaint puts it, "their share of said profits," i. e. the profits received by defendants as and when ascertained.

The case coming on to be tried and the testimony having been closed, both sides moved for the direction of a verdict. The court directed verdict and judgment in favor of defendants, and plaintiffs took this writ.

Blandy, Mooney & Shipman, of New York City (Edmund L. Mooney, Terence Farley, Charles T. B. Rowe, Edgar A. Martin, and Frederick A. Card, all of New York City, of counsel), for plaintiffs in error.

Rounds, Schurman & Dwight, of New York City (Martin W. Littleton and Charles E. Hughes, Jr., both of New York City, and Otis B. Kent, of Washington, D. C., of counsel), for defendants in error.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). We shall not dwell on the pleadings, though argument has been based thereon, but prefer to meet the larger question;—whether on the facts shown plaintiffs have any right, in any form of action, to any share of the profits of selling the cotton in Spain.

Whatever rights plaintiffs enjoy obviously arise out of the agreements they made. Those written agreements consist of the contracts

292 F.—62

with Frierson and defendants, effective on the same day, February 28, 1917, fully set forth supra,—and of nothing else.

[1] It is assigned for error that certain oral evidence said to be explanatory or illuminative of the meaning of these writings, was excluded. No error was committed. It is true that these documents bristle with trade words, the meaning of which is known only to those dealing in cotton. But these terms required no explanation to the parties. The testimony was offered, not to explain words, but to fix the legal relation created by the agreements between plaintiffs, defendants and/or Frierson.

On this point the written contracts (which are to be construed together) offer no ambiguity; their language is plain and simple. Therefore it is conclusively presumed that the parties meant what the words which they used mean, and no oral evidence was permissible. What they meant, and all that they meant, must be spelled out of the plain words they wrote. It is sufficient to refer to our decisions in Watkins v. Mulkey, 225 Fed. 739, 141 C. C. A. 11; Bijur, etc., v. Eclipse, 243 Fed. 600, 156 C. C. A. 298; and Schnerb v. Holt Co. (C. C. A.) 289 Fed. 1001 (April 9, 1923), and cases cited.

The facts presented, which were fairly summed up in defendants' application to the War Trade Board (supra), raise two questions: (1) What was the nature and extent of plaintiffs' interest in the subject-matter of agreement, and (2) what was the effect upon that agreement of the declaration of war on April 6th, or the Trading with the Enemy Act, effective October 6th.

[2] As to the first point it is asserted, and may be conceded, that the written agreements show a "joint adventure." This comparatively modern phrase means no more than a commercial enterprise by several persons jointly. Its vogue arises from a desire to find words descriptive of a joint enterprise yet not amounting to a partnership. A distinctive characteristic of the joint adventurer is his right of suing at law for his share; he is not obliged to resort to an accounting as is a partner. The distinction is pointed out in Felbel v. Kahn, 29 App. Div. 270, 51 N. Y. Supp. 435, where a transaction fundamentally similar to the one at bar is described as a "joint adventure to share in the profits of a contemplated speculation in real estate, which were ascertainable by a simple calculation." Consequently plaintiff's demand for "his share" was entertained at law. These plaintiffs have pursued the same course.

[3] Assuming now that this was a joint adventure, what did the joint adventurers respectively contribute, and what was the subject-matter of their joint action?

The plaintiffs contributed a customer, viz. the Austrians. Frierson contributed the management of the enterprise, including especially the care and custody of the cotton in Barcelona. The defendants contributed all the money, capital, or credit required for the transaction. The subject-matter of the adventure was very simple, namely the keeping and selling to certain Austrians (and to no one else) 10,000 bales of cotton.

This being the joint adventure, the crucial question is to whom did the cotton belong while it was awaiting delivery? It is plain that the joint adventurers did not jointly buy the cotton; Frierson did that. Nor did the joint adventurers jointly pay for the cotton; defendants did that. The only interest that plaintiffs had in the cotton, or in the enterprise, transaction, or adventure, was a right to share in the profits of selling to the Austrian spinners. That is to say, when the Austrian spinners could take the cotton, plaintiffs were entitled to one-half of what defendants and Frierson made over the cost of thè cotton to them plus the carrying charges.

Thus we deem it apparent that never at any time did plaintiffs have any interest in or title to the cotton as cotton; Frierson had the legal title, but it was security to defendants for their advances and expenses.

[4] As to the question of the effect on the adventure of the declaration of war and/or the Trading with the Enemy Act, we entertain no doubt. On April 6th, Austria became an ally of the enemy, and on and after October 6th, it became unlawful for any person in the United States to trade directly or indirectly for the benefit of any other person with the knowledge, or with reasonable cause to believe, that such other person was an ally of the enemy. Act, § 3a (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½b).

As was well pointed out by the trial judge, delivery after peace (although such peace plainly referred to peace between warring European powers) was not the "whole performance because it included retention of the cotton at Barcelona during the remainder of the war." Thus, since trading by the statute (section 2 [section 3115½aa]) included "carrying on" any contract, agreement or obligation, defendants and Frierson found themselves in the position of carrying on this agreement for the benefit of certain Austrians. Therefore the Trading with the Enemy Act completely excused, and indeed forbade, performance by defendants and/or Frierson. Result is that by statute this contract came to an end as soon as defendants were refused their license or permission to complete the agreement.

We might go farther, as we are of opinion that this agreement became against public policy on April 6, 1917. The effect of the contracts made was that the money, property, and credits of certain citizens of the United States were tied up or engaged in the carrying or keeping of 10,000 bales of cotton for the ultimate benefit of an ally of an enemy.

The contract may be called executory; it was so in the usual sense of the term, but there was nothing executory about the absorption of defendants' money and credits in the carrying of this cotton for Austrians. As was well said by Lord Sumner in Ertel v. Rio Tinto (1918) A. C. 260, at 290:

"It is incidental to the conduct of war that the sovereign should be free to bring pressure to bear on the enemy by crippling his commerce and exhausting his resources. It is incidental to the conduct of war that the resources of the sovereign's subjects should be free to be employed lawfully in preserving and extending the resources of the realm."

From this premise the learned judge deduced the conclusion that even an executory contract which prevented the resources of the citizens of a sovereignty at war from being employed in preserving and extending the resources of their own warring country was invalid as against public policy; and that doctrine and that case apply to this transaction.

If, as we now hold, the whole agreement or joint adventure came to an utter end not later than October 6, 1917, it obviously became impossible for plaintiffs to sue upon the contract, for that contract no longer existed; it had been wiped out by sovereign authority.

But if, and only if, plaintiffs were co-owners in the cotton, they would still have a right to share, in proportion to their interest, in the proceeds of that cotton whenever lawfully obtained.

But this just claim would arise, not by breach or performance of contract, but by virtue of ownership in the cotton. As we have already pointed out, plaintiffs never had any such ownership; their only interest in the joint adventure was in profits obtained from sale to certain specified persons of their procurement, to wit, the Austrian spinners. That interest, because of its Austrian origin and taint, was wiped out, and with it vanished all right of recovery in plaintiffs.

Judgment affirmed, with costs.

MANTON, Circuit Judge (dissenting). I can agree with the prevailing opinion in the conclusion that the transaction here was a joint adventure, and, further, that the terms of the contract between the parties must be found within the memorandum set forth in the opinion. Reading the agreement, it will be found that the parties contracted to purchase cotton and sell it to the plaintiffs' customer, but delivery was to be made only after peace was declared. In the meanwhile, the cotton was to be kept in a warehouse at Barcelona, Spain. The agreement and delivery of the cotton at Barcelona, Spain, was all prior to our entry into the war or the effective date of the Trading with the Enemy Act. Up to this stage, there was nothing illegal or contrary to public policy in the transaction. I take it the prevailing opinion concedes this. The contract provides:

"The parties of the second part are to arrange with the firm of Frierson Bros. to ship the 10,000 bales of cotton to Barcelona, and to carry same in their name until final delivery *after peace has been arranged.*"

And it is further provided:

"There shall also be entered on the credit side of said statement the carrying charges collected from the buyers for the period intervening between May 1, 1917, and *the date of eventual delivery.*"

"There shall further be entered on this statement, on the debit or credit side, as the case may be, any losses or profits accruing through the transferring of exchanges from dollars to pesetas, or vice versa."

Their contract further provided for an equal division of the profits after certain deductions named therein were made. It will be noted that in the memorandum of agreement between Frierson Bros. and the plaintiffs set forth in the prevailing opinion, the carrying charges were provided for until "peace had been officially concluded." Looking solely to the agreement between the parties set forth, it is very appar-

ent that the parties did not intend a delivery until peace was declared, and that, in the meantime, the joint adventure continued. The fact is that the joint adventure was ended before peace was declared by the action of the defendants.

Assuming, as the prevailing opinion does, that this was a justifiable abandonment of the adventure by one of the parties, can it be doubted that the profits or losses sustained up to that time must be shared equally by all the parties? Here were profits by the sale of the cotton, and there should be an adjustment thereof which may be had either by an accounting between the parties or by an action at law with the burden of proof upon the appellants to establish their case. Brooks v. Martin, 69 U. S. (2 Wall.) 70, 17 L. Ed. 732; McBlair v. Gibbes, 58 U. S. (17 How.) 232, 15 L. Ed. 132; Felbel v. Kahn, 29 App. Div. 270, 51 N. Y. Supp. 435. While the cotton was to be in the name of Frierson Bros., this must be deemed to have been for the benefit of all the parties, and upon the resale all parties are entitled to the benefits accruing, just as all parties would be obligated to the losses subsequently sustained. Burhans v. Jefferson, 76 Fed. 25, 22 C. C. A. 25; Stover v. Flack, 30 N. Y. 64.

It is quite true that the party making the advances of money and the other of labor may fix the terms upon which the profits may be divided, and such terms are binding upon those accepting them. Gordon v. Boppe, 55 N. Y. 665. And here the parties provided for such division. It has been held that where property is purchased as a joint adventure, it is not material in whose name the title is taken, as any one holding the title is regarded as a trustee for his associates. Hubbell v. Buhler, 43 Hun (N. Y.) 82. Just as property paid for out of the receipt of the joint adventure becomes joint property of all the parties. Hayden v. Eagleson, 15 N. Y. St. Rep. 200. While a joint adventure is not identical with a partnership, it is regarded as if of a similar nature and governed by the same rules of law. Marston v. Gould, 69 N. Y. 220; Chester v. Dickerson, 54 N. Y. 1, 13 Am. Rep. 550. The principal distinction is that in most jurisdictions one party may sue the other at law for breach of the contract or a share of the profits or losses or a contribution for advances made in excess of his share. But his right will not preclude a suit in equity for an accounting. Even if the contract be against public policy, if it is closed, the party receiving the profits must account to his associates. Wann v. Kelly (C. C.) 5 Fed. 584; McMullen v. Hoffman (C. C.) 75 Fed. 547. But there was no illegality in maintaining the cotton in Barcelona in a warehouse until peace was declared when again it might be lawful to deal with Austrian spinners. This was what should have been done to carry out the terms of the contract. It was the defendants who sold without the consent or approval of the plaintiffs. This was an abandonment of the adventure, and the parties sustaining a loss by reason of this breach should be entitled to receive their share at least of what the one committing the breach profited by the resale.

Because of this, I think the plaintiffs in error are entitled to a reversal of the result below, and I therefore dissent from the judgment about to be announced.